UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

AMY LORRAINE RINGHAUSEN,

        Plaintiff,

v.                                    CASE NO. 3:19-cv-1014-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

        Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for a period of disability and disability insurance benefits ("DIB").  Following an administrative hearing held by video on September 12, 2018, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from December 9, 2015, the alleged disability onset date, through October 25, 2018, the date of the ALJ's decision.[2] (Tr. 12-64, 158.)  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 13.)

[2] Plaintiff had to establish disability on or before December 31, 2021, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 16.)

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff contends that the ALJ erred by failing to evaluate the opinion evidence in accordance with Agency policy and Eleventh Circuit precedent. Specifically, Plaintiff argues that the ALJ erred in assigning little weight to the

opinions of her treating pain management specialist, Hector Pagan, M.D., and her examining doctor, Ciceron Villavicencio Lazo, M.D., while according great weight to the opinion of the State agency non-examining medical consultant, Edmund Molis, M.D.  Plaintiff explains that the ALJ erroneously relied on his own interpretation of the medical evidence and on Dr. Molis's outdated opinion, which was issued two years prior to the ALJ's decision.  Plaintiff points out that the ALJ never requested an updated review of the record by a State agency consultant, never arranged for a consultative examination of Plaintiff, and never re-contacted any of the treating or examining sources who issued opinions regarding Plaintiff's functional limitations.  Further, Plaintiff points out that the opinions of Dr. Pagan and Dr. Lazo, which limited Plaintiff to less than full-time work and precluded the lifting and carrying requirements of light work, establish far greater limitations than assessed by the ALJ.  Thus, if it is determined that Plaintiff is unable to perform light work, her past work of a companion, which requires frequent reaching, handling and fingering, would be eliminated.  Defendant responds that the ALJ properly evaluated the medical opinions of record and his residual functional capacity ("RFC") assessment is supported by substantial evidence.

### A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of*

*Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2

4

(11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834,

835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state

agency medical and psychological consultants because they 'are highly qualified

physicians and psychologists, who are also experts in Social Security disability

evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per

curiam); *see also* SSR 96-6p[3] (stating that the ALJ must treat the findings of

State agency medical consultants as expert opinion evidence of non-examining

sources).  While the ALJ is not bound by the findings of non-examining

physicians, the ALJ may not ignore these opinions and must explain the weight

given to them in his decision.  SSR 96-6p.

### B.    Relevant Evidence of Record

### 1.    Treatment Records[4]

On December 9, 2015, Plaintiff suffered a slip-and-fall injury at Walgreens,

after which she was diagnosed with contusion of her left hip, foot, and knee.  (Tr.

254-57, 317, 324, 335, 338, 350.)  Plaintiff reported that the pain was constant

---

[3] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017.  However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

[4] The medical records predating the alleged disability onset date are not included in this section.  However, the Court notes that Plaintiff had preexisting arthritis and a herniated disc, and a cervical MRI, dated June 19, 2014, revealed reversed lordosis, diffuse degenerative disc changes, and mild circumferential disc bulging with associated osteophytes at C6-C7 with a small superimposed central disc herniation (protrusion) impinging upon the anterior thecal sac.  (Tr. 252, 450.)

and was interfering with her daily activities and sleep; it was aggravated by driving, getting in and out of the car, bending, sitting, standing, walking, twisting, reading, looking down, turning her head, and any activities of daily living; and it was relieved by rest, ice/heat packs, physical therapy, chiropractic care, shifting positions, and medications.  (Tr. 324, 334-35, 338, 350-51, 449, 484, 528.) Plaintiff consistently rated her pain as severe or moderate and stated that the pain made her nauseous.  (*See, e.g.*, Tr. 455 (noting a pain level of 9-10 on a scale of 0 to 10); Tr. 449, 528, 554 & 571 (noting a pain level of 9); Tr. 458, 470, 519, 537, 557, 560 & 567 (noting a pain level of 8); Tr. 461 & 565 (noting a pain level of 6 and 7); Tr. 473 (noting a pain level of 5 and 6); *but see* Tr. 540 & 569 (noting a pain level of 4); Tr. 579 (noting a pain level of 2-3).)

A radiographic examination, dated December 18, 2015, showed, *inter alia*, a reversal of the normal anterior curve of the cervical spine, scoliosis on the left of the thoracic spine, narrowing of the weight-bearing disc spaces at L3-L4, L4-L5, and C5-C7, bone spurs at C5-C6 and C6-C7, anterior osteophyte formation at L4-L5, and degenerative changes in the sacro-iliac joints.  (Tr. 332, 337-38.) An examination from the same day revealed, *inter alia*, intense pain at C3, T9, and T10 on the left, at T4 and T5 on the right, and at C4, C5, L5, and sacrum bilaterally, on palpation; moderate fixation at C3-C5, T4, T5, T9, T10, L5, and sacrum; a complete spasm in the cervical paraspinal and lower thoracic muscles on the left, in the upper and mid thoracic muscles on the right, in the cervical and lumbar paraspinal muscles, and in the gluteal muscles bilaterally, on palpation.

6

(Tr. 338.)  In addition, Kemp's, Patrick's, and Hyperextension tests were all positive bilaterally.  (Tr. 339.)  Plaintiff's cervical and lumbar range of motion was decreased on flexion and extension.  (*Id.*)  On December 21, 2015, Plaintiff continued to report mid and low back pain rated at 9 on a scale of 0 to 10.  (Tr. 339-40.)  She was scheduled for chiropractic treatment three times a week.  (Tr. 340, 365.)

On January 7, 2016, Plaintiff had an initial evaluation with Dr. Pagan.  (Tr. 350-53.)  On examination, the anterior aspect of the cervical spine was swollen; the iliac crests were uneven; the left medial compartment of the knee was sharply painful on compression, exhibiting difficulty with weightbearing; there was pain on compression to the left greater occipital nerve groups; taut bands of indurated painful muscle were present to the posterior cervical triangle muscles, trapezius, and levator scapula; swelling was present on the soft tissues of the cervicothoracic junction; localized tenderness was present in the upper cervical spine, thoracolumbar junction, lower lumbar spine, and posterior spinous process; myofascial trigger points were present; the cervical spine had limited mobility; and the lumbar flexion was severely restricted.  (Tr. 351-52.)  Plaintiff was diagnosed with, *inter alia*, thoracic and lumbosacral sprain/strain; myositis; lumbar and cervical somatic dysfunction; left lumbar radiculitis; left knee pain; and antalgic gait patterns.  (Tr. 352.)  She was prescribed "a series of injections and manual therapy complemented of [sic] the course of chiropractic physical therapy."  (Tr. 353.)

7

On January 11, 2016, Plaintiff underwent an MRI of the lumbar spine, which showed L4-L5 Grade 1 retrolisthesis; severe intervertebral disc desiccation with a small left paracentral broad-based disc bulge, resulting in minimal left-sided neural foraminal narrowing; and partial sacralization of the L5 vertebral body.  (Tr. 346, 356; *see also* Tr. 343 (noting L4-L5 Grade 1 retrolisthesis and primarily left-sided disc herniation).)  On that day, Plaintiff also underwent an MRI of the left knee, which showed minimal subchondral cystic changes of the inferior articular surface of the medial femoral condyle.  (Tr. 345.)

On February 9, 2016, Plaintiff was diagnosed with post-traumatic left knee anserine bursa and sprain/strain, cervicalgia, cervical radiculitis/neuritis, probable cervical disc displacement, lumbago, and lumbar radiculitis/neuritis and disc displacement.  (Tr. 343.)  The same day, she received a cortisone injection in her left knee.  (Tr. 365.)  She was advised to return to Dr. Pagan for lumbar epidural steroid injections at L4-L5 and to seek physical therapy.  (Tr. 343-44.)  On February 23, 2016, Plaintiff's examination findings were again positive, including a positive Kemp's test bilaterally, Patrick's test bilaterally, extension bilaterally, and shoulder depression.  (Tr. 335.)

On February 24, 2016, Plaintiff commenced physical therapy at CORA Rehabilitation Clinics three times a week to address her difficulty performing activities of daily living.  (Tr. 367-91 (showing visits on February 24, 26, and 29, March 3, 4, 7, 9, 11, 14, 16, 21, 23, 25, 28, and 30, April 1, 5, 7, 8, 11, 13, and 15, 2016).)  In the meantime, she was also seeing Dr. Ronald Joseph and Dr.

Pagan for injection therapy.  (Tr. 355, 365, 590.)  For example, on March 10, 2016, Plaintiff presented to Dr. Joseph "with increasing problem in her right foot, pain and discomfort, [and] numbness at the heel level."  (Tr. 590.)  She had "positive Tinel sign at the tarsal tunnel as well as [a] positive compression test."  (*Id.*)  On March 17, 2016, Plaintiff presented to Dr. Pagan, who wrote: "Cervical mobility and lumbar mobility were restricted.  Complaints are exacerbated by standing.  Myofascial trigger points are present to the trapezial, levator scapula, [and] quadratus lumborum."  (Tr. 355.)

On April 15, 2016, after completing twenty-two (22) physical therapy visits and having met only 30% of her short-term and long-term goals, Plaintiff was placed on hold and sent back to her medical doctor "for further investigation of symptoms" due to her "lack of progress with conservative management."  (Tr. 390 (also noting "limiting factors[,] such as reports of second[-]day pain after cleaning house, performing lawn work, [and] attending movie theater"); Tr. 393.)  On April 20, 2016, during her injection appointment with Dr. Joseph, Plaintiff reported that her physical therapy provided only transient relief, her lumbar spine pain was constant and severely worse with walking, and her neck pain was also "constant[,] with numbness and tingling going to the left thumb and left big toe."  (Tr. 365.)  On April 22, 2016, Plaintiff was discharged from physical therapy.  (Tr. 392-93.)

On June 22, 2016, she was sent back to Dr. Pagan for lumbar epidural steroid injections, which she declined, and was then referred to Edgar T. Vesce,

D.C., CCSP, for further therapy.  (Tr. 445.)  On June 24, 2016, Plaintiff presented

to Dr. Vesce for evaluation and treatment of her injuries sustained during the slip-

and-fall accident on December 9, 2015.  (Tr. 449.)  The orthopedic examination

revealed, in pertinent part:

> O'Donahue's Maneuver:
> . . . An increase in pain was noted in the cervical and upper thoracic region that was rated as a Grade 2: Moderate pain observed and reported.  Her movement was observed to be painful.
>
> Spurling's Test:
> Spurling's test was positive bilaterally for localized pain.  . . .  A positive Spurling's test for localized cervical symptoms without radiculopathy is SUGGESTIVE OF SOFT CONNECTIVE TISSUES, OR FACETS AS THE PAIN SENSITIVE STRUCTURES [sic].  An increase in pain was noted in the left cervical, left cervical dorsal, right cervical and right cervical dorsal region that was rated as a Grade 2: Moderate pain observed and reported.  Her movement was observed to be painful.
>
> Schepelmann's Test[:] . . . .  This test produces pain bilaterally of the convex sides.
>
> Kemp's Test:
> Kemp [t]est was positive bilaterally for localized pain.  . . .  An increase in pain was noted in the lumbar and sacral region that was rated as a Grade 2: Moderate pain observed and reported.  Her movement was observed to be painful.
>
> Yeoman's Test:
> Yeoman's [t]est was positive bilaterally.  . . .  An increase in pain was noted in the left sacroiliac, right sacroiliac, lumbar and sacral region that was rated as a Grade 2: Moderate pain observed and reported.
>
> Patrick FABERE Sign:
> Patrick's [t]est was positive bilaterally.  . . .  A POSITIVE TEST SUGGESTS HIP JOINT DISEASE . . . .
>
> Nachlas' Test:
> . . . The test is positive for pain bilaterally and is indicative of

sacroiliac disorder.

Spinal Palpation:
. . .
Palpation reveals areas of spasm, hypomobility and end point tenderness indicative of subluxation at right C1, right C2, left C3, left C4, right C6, right C7, right T1, right T2, left T3, left T5, left T6, left T7, right T8, right T10, right T11, right L1, left L2, left L3, right L4, right L5, right sacrum and right pelvis.

Palpation of the muscles revealed spasm in the following areas: left cervical, right cervical, left cervical dorsal, right cervical dorsal, upper thoracic, left mid thoracic, right mid thoracic, lower thoracic, left lumbar, right lumbar and sacral.

(Tr. 451-53.)

Chiropractic adjustments two or three times per week were recommended. (Tr. 453.)  Plaintiff received specific spinal adjustments, mechanical traction, manual therapy, and electrical stimulation at this visit.  (Tr. 454.)  She continued seeing Dr. Vesce for spinal adjustments, mechanical traction, manual therapy, electrical stimulation, and cervical spine decompression on June 27 and 29, July 1, 7, 8, 11, 13, 15, and 18, August 2, 4, 9, 12, 16, and 18, September 8, October 21, November 18, and December 16, 2016; on January 13, February 9, March 10, July 24 and 28, 2017; and on January 18, 19, 23, and 25, 2018.  (Tr. 455-81, 528-80.)

On July 11, 2016, Plaintiff underwent a cervical spine MRI, which showed:

1.      2 mm bulge asymmetric toward the right side at C6-C7 level. 2.5 mm anterolisthesis at C4-C5 and C5-C6 levels in neutral position may represent some laxity of the posterior longitudinal ligament.

2.      Lateral osteophyte and uncovertebral hypertrophy are causing

> mild to moderate left neural foraminal narrowing at C6-C7
> level.  Reversal of the cervical lordotic curvature may be
> secondary to positioning vs. muscle spasm.

(Tr. 446.)

On August 9, 2016, Dr. Vesce noted: " Amy had multiple episodes of increased pain since her last treatment.  She drove for 40 minutes and when getting out of her car she had to slowly walk bent over.  After a couple minutes she was able to stand erect and walk with less pain."  (Tr. 534.)  On August 12, 2016, Plaintiff was "having a lot of increased pain after doing some light household chores" the day before.  (Tr. 537.)

On August 15, 2016, Plaintiff reported to Dr. Pagan that therapy and chiropractic care provided only short-lived relief, and as soon as she became involved in physical activity, her "complaints flare[d] up in her low back area".  (Tr. 526.)  Dr. Pagan's progress note also stated, in relevant part:

> She has not followed up with Sea Spine since they told her she
> needed back surgery.
> . . .
> Continue with Dr. Vesce.  Reevaluate diagnostic studies, consider
> cervical and lumbar epidural steroid injections, consider surgical
> options.  The patient is at the tail end of what I can do for her, as it
> relates to conservative therapy.

(*Id.*)

The "objective final evaluation," performed by Dr. Vesce on August 18, 2016, revealed, in pertinent part:

> Sensory Examination . . . [was] considered normal except [for] C5,
> C6[,] and T1 on the right[,] . . . [and] except [for] L4 on the right.
> . . .

12

Spurling's Test:
Spurling's test was positive bilaterally for localized pain.  . . .  A positive Spurling's test for localized cervical symptoms without radiculopathy is SUGGESTIVE OF SOFT CONNECTIVE TISSUES, OR FACETS AS THE PAIN SENSITIVE STRUCTURES [sic].  An increase in pain was noted in the cervical and upper thoracic region that was rated as a Grade 2: Moderate pain observed and reported. Her movement was observed to be painful.

O'Donahue's Maneuver:
O'Donahue's Maneuver was positive bilaterally.  . . .  An increase in pain was noted in the left cervical, left cervical dorsal, right cervical and right cervical dorsal region that was rated as a Grade 2: Moderate pain observed and reported.  Her movement was observed to be painful.

Kemp's Test:
Kemp's [t]est was positive bilaterally for localized pain.  . . .  An increase in pain was noted in the lumbar and sacral region that was rated as a Grade 2: Moderate pain observed and reported.  Her movement was observed to be painful.

Nachlas' Test:
. . .  The test is positive for pain bilaterally and is indicative of sacroiliac disorder.

Yeoman's Test:
Yeoman's [t]est was positive bilaterally.  . . .  An increase in pain was noted in the lumbar, sacral, left sacroiliac and right sacroiliac region that was rated as a Grade 2: Moderate pain observed and reported.

Spinal Palpation:
. . .
Palpation reveals areas of spasm, hypomobility and end point tenderness indicative of subluxation at right C1, left C3, left C4, right C6, right C7, right T1, right T2, left T6, right T8, right T10, right T11, right L1, left L3, right L4, right L5, right sacrum and right pelvis.

Palpation of the muscles revealed spasm in the following areas: left cervical, right cervical, left cervical dorsal, right cervical dorsal, upper thoracic, left mid thoracic, right mid thoracic, lower thoracic, left lumbar, right lumbar and sacral.

(Tr. 544-46.)  Dr. Vesce wrote: "At this point[,] it has been determined that Ms. Ringhausen has reached maximum medical improvement (MMI).  She is now placed on PRN [pro re nata] status to be seen on an as needed basis."  (Tr. 546.)  On September 8, 2016, Plaintiff saw Dr. Vesce again and reported that she had "been very sore with intense pain as of lately" and experienced "frequent sharp pain on certain motions."  (Tr. 548.)

On September 15, 2016, Plaintiff saw Dr. Pagan who authored a narrative report regarding her functional abilities.  (Tr. 483-89.)  The progress note from that day indicted that Plaintiff's complaints were unchanged; she continued to experience pain in the neck, upper and lower back, and left shoulder; and she continued to have daily headaches.  (Tr. 525.)  On examination, there was tightness and induration in multiple areas of Plaintiff's back, and restricted lumbar flexion and extension.  (*Id.*)  Dr. Pagan wrote that depending on Plaintiff's response to the lumbar epidural steroid injections and nerve conduction velocity, she could be referred back to Sea Spine for an orthopedic re-evaluation.  (*Id.*)

In his narrative report of September 15, 2016, Dr. Pagan opined that Plaintiff could sit for no more than 30 minutes, stand for no more than an hour (if able to alternate positions), and lift and carry ten pounds or less.  (Tr. 486.)  Under "Physical Finding[s] and Objective Studies," Dr. Pagan wrote:

> Limitations in mobility of the cervical spine were present on rotation and lateral flexion.  There is fullness of the paraspinous and swelling of the cervicothoracic junction.  Painful ligament lesions are present to posterior spinous process of L5 and both iliolumbar.

Grade 1 retrolisthesis of L4 on L5.  Severe intervertebral disc desiccation at this level is noted with a small left paracentral broad based disc bulge, resulting in minimal left sided neural foraminal narrowing.

No evidence of severe acquired central canal stenosis at any level.

(Tr. 487.)  Dr. Pagan opined that Plaintiff was "not able to return to full 40 hours work schedule in a consistent and dependable basis."  (*Id.*)  Under "Treatment Recommendations," he noted: "Trigger point injections, ligament injections, medication management, [and] therapy.  She has been referred to Sea Spine Orthopedic for a surgical evaluation and Dr. Vesce for chiropractic care."  (*Id.*)

On November 18, 2016, Plaintiff reported "increased pain as she was attempting to do some low impact[,] low intensity body weight squats, dancing and stretching."  (Tr. 554 (also noting a pain level of 9).)  At the follow-up visits on December 16, 2016, January 13, February 9, March 10, and July 24, 2017, Plaintiff did not see any significant improvement in her pain level.  (Tr. 557, 560, 563, 565, 567.)  Although she felt improvement on July 28, 2017 (Tr. 569), she returned to Dr. Vesce's office on January 18, 2018 "with a new complaint of lower thoracic, lumbar, sacral and mid thoracic discomfort," rated as a 9 on a scale of 0 to 10.  (Tr. 571.)  On that day, Kemp's test, Nachlas' test, and Yeoman's test were all positive bilaterally, and there were spasms, hypomobility, and end point tenderness indicative of subluxation at C2, C3, C5, C7, T2, T4, T5, T6, T9, T12, L1, L2, L3, L4, L5, sacrum, and right and left pelvis.  (Tr. 571-72.)  On both January 18 and 19, 2018, Plaintiff underwent spinal adjustments, manual

therapy, electrical stimulation, and mechanical traction.  (Tr. 573-76.)  On

January 23, 2018, her pain was less intense and continued to improve according

to the progress note from January 25, 2018.  (Tr. 577-80.)

### 2.    Examining Doctor

On July 17, 2018, Plaintiff was examined by Dr. Lazo.  (Tr. 592.)  He

summarized Plaintiff's complaints as follows:

> She complains of pain on [sic] daily and is aggravated mainly with
> repetitive activity at home or even being in the car driving.  Standing,
> bending, driving, walking, cold and rain weather also adds [sic] to
> her pain as well [sic].  Client describe[s] the pain [in] the neck area
> as a sharp pain and associated [sic] with muscle spasm and
> tightness and for the past coup[l]e of weeks her neck was locking up
> and she had to turn the entire body to turn [sic] in order for her to
> drive[.]  She states she will have numbness and tingling [in] both
> hands but . . . mainly at night and has some difficulty with opening
> bottles and jars.  She states that her pain the pain [sic] on the lower
> back will radiate[] to the [right] buttock and will stop at the knee.  She
> states that she will have [left] hip pain radiates [sic] [to] the [left] knee
> as well.  Client has noticed that her both [sic] knees will give out on
> her[,] but she denies falling.  Her pain is subsiding by putting a pillow
> underneath her neck, [using] a massage chair and tens unit[,] and
> taking over the counter medication which drops [the pain] to about
> [a] 4 out [of] 10[,] and the pain with aggravation is about [an] 8 out
> [of] 10.

(*Id.*)

On physical examination, Plaintiff had moderate muscle tension in the

shoulders and scapula area; full range of motion in the cervical spine, but with

discomfort; moderate thoracolumbar scoliosis, moderate paravertebral muscle

syndrome, and diminished range of motion in the thoracolumbar spine; mild

interphalengel joint deformity of the upper extremities and moderate swelling and

deformity of the first MJ; knee tenderness and ability to half squat with knee pain; poor balance; and inability to walk on heels due to lower back pain.  (Tr. 593-94 (also noting that the Straight Leg Raising test was 80 degrees in the supine position and 90 degrees in the sitting position, bilaterally).)  Dr. Lazo assessed degenerative disc disease and herniated disc at C6-C7 causing neck and upper back pain; low back pain due to lumbosacral strain, sprain, and herniated disc at L4-L5; and left knee sprain and possible medial meniscus injury.  (Tr. 594.)

On July 18, 2018, Dr. Lazo completed a Medical Source Statement ("MSS") based upon his physical examination of Plaintiff and review of medical records, including MRI results of the lumbar spine dated January 11, 2016, MRI results of the cervical spine dated June 19, 2014 and July 11, 2016, MRI results of the left knee dated January 11, 2016, and treatment records from Dr. Pagan and Sea Spine Orthopaedics.  (Tr. 597-98.)  In the MSS, Dr. Lazo opined that Plaintiff could sit for two to three hours and stand for one to two hours in an eight-hour workday on a sustained basis.  (Tr. 597.)  He also opined that Plaintiff could lift/carry ten pounds occasionally, five pounds frequently, and less than five pounds constantly; she could reach only rarely; and she could handle, feel, and finger only occasionally due to radicular pain.  (*Id.*)  Dr. Lazo further opined that a job requiring Plaintiff to sit or stand for prolonged periods (or a job not providing an opportunity to recline) during an eight-hour workday would increase her level of pain; that the increase in pain would cause serious distraction from job tasks and/or result in a failure to complete job tasks in a timely manner more than

occasionally; and that the opined restrictions applied as of December 12, 2015. (Tr. 598.)

### 3.      State Agency Non-Examining Doctor

On October 27, 2016, based on a review of the records available as of that date, the State agency non-examining consultant, Dr. Molis, completed an RFC Assessment of Plaintiff's abilities.  (Tr. 83-87.)  Dr. Molis opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday; could frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards and vibration.  (Tr. 84-85.)  Further, Dr. Molis opined that Plaintiff should be limited to frequent manipulative functions and her reaching should be limited as to any direction, including overhead.  (Tr. 85.)

### C.      The ALJ's Decision

The ALJ found at step two of the sequential evaluation process[5] that Plaintiff had the following severe impairments: lumbar degenerative disc disease, cervical disc bulge at C6-7, left knee subchondral cystic changes of the medial femoral condyle, bilateral shoulder impingement syndrome, and obesity.  (Tr. 18.)

---

[5] The Commissioner employs a five-step process in determining disability.  *See* 20 C.F.R. § 404.1520(a)(4).

Further, the ALJ found that Plaintiff had the RFC to perform light work[6] with the

following limitations:

> [T]he claimant is limited to lifting and carrying 20 pounds
> occasionally and 10 pounds frequently.  The claimant is limited to
> sitting (with normal breaks) for about 6 hours out of an 8-hour
> workday.  The claimant is limited to standing or walking (with normal
> breaks) for about 6 hours out of an 8-hour workday.  The claimant is
> limited to never climbing ladders, scaffolds or ropes.  The claimant is
> limited to frequent balancing as well as occasional stooping,
> kneeling, crouching, crawling and climbing ramps or stairs.  The
> claimant is limited to occasional overhead reaching bilaterally.  The
> claimant is limited to avoiding concentrated exposure to work
> hazards[,] such as unprotected heights and fast or dangerous
> moving machinery.

(*Id.*)

In making this finding, the ALJ discussed, *inter alia*, Plaintiff's subjective

complaints, the objective medical findings, the treatment and examining records,

and the opinion evidence.  (Tr. 18-23.)  With respect to the opinion evidence, the

ALJ made the following findings:

> Dr. Pagan is an acceptable treating medical source.  In September
> of 2016, Dr. Pagan wrote a letter that noted the claimant's medical
> history, symptoms and course of treatment, and indicated the
> claimant was limited to sitting for no more than 30 minutes, standing
> no more than 1 hours [sic] if able to alternate positions, lift and carry
> 10 pounds or less, was unable to answer if the claimant could
> sustain a full work day or week but then went on to indicate the
> claimant was unable to return to a full 40-hour work schedule on a
> consistent and dependable basis.  (Ex. 11F, pp. 4-5).  The [ALJ]
> affords those statements little weight, as they are not consistent with
> the more recent medical examination documenting full range of

---

[6] By definition, light work involves lifting no more than twenty pounds at a time
with frequent lifting or carrying of objects weighing up to ten pounds; it requires a good
deal of walking, standing, or sitting most of the time with some pushing and pulling of
arm or leg controls.  20 C.F.R. § 404.1567(b); SSR 83-10.

motion of the spine and joints, 5 [out] of 5 strength in the extremities and unimpaired gait.  (Ex. 15F).

The [ALJ] has considered the statements of Ciccrom [sic] Lazo, M.D. (Ex. 15F, pp. 7-8).  Dr. Lazo is an acceptable examining medical source.  After examining the claimant, Dr. Lazo stated the claimant could sit for up to 3 hours out of an 8-hour workday, stand or walk for up to 2 hours in an 8-hour workday, rarely reach, occasionally handle, finger and feel, would have more than occasional interruption of work activities due to pain symptoms, and stated the claimant's limitations existed as of the alleged onset date.  (Ex. 15F, pp. 7-8).  The [ALJ] affords those statements little weight, as they are not consistent with the objective [observations] in the record showing the claimant had 5 [out] of 5 strength of the extremities, full range of motion throughout, and no focal neurological deficits.  (Ex. 15F, pp. 3-4).  It is also inconsistent with the claimant's mild to moderate diagnostic spinal imaging, and the very mild shoulder x-rays contained in the record.

. . .

The [ALJ] has considered the State agency medical consultant's assessments [sic].  (Ex. 4A).  The State agency medical consultant is an acceptable reviewing medical source.  After reviewing the medical evidence of record, the State agency medical consultant determined the claimant was capable of performing a range of light work activity.  (Ex. 4A, pp. 8-11).  The [ALJ] accepts that the claimant is capable of working a range of light work activity.  Those findings are consistent with the mild to moderate spinal diagnostic imaging, the very mild shoulder imaging, the physical observations documenting 5 [out] of 5 strength of the extremities, full range of motion, normal gait and no focal neurological deficits as well as the claimant's conservative course of treatment.  (Ex. 1F; 2F; 4F; 5F; 6F; 7F; 9F; 13F; 15F).  Therefore, the [ALJ] affords the State agency medical consultants' [sic] assessments great weight.

(Tr. 21-22.)

The ALJ concluded that Plaintiff was "no more limited than established by the above [RFC] assessment as supported by the longitudinal record taken as a whole."  (Tr. 22.)  The ALJ explained:

The claimant's spinal imaging documented mild to moderate changes and is supportive of impairments causing pain complaints alleged by the claimant.  Shoulder imaging was interpreted to show mild and diffuse degenerative changes to the bilateral shoulders.  The most recent physical examination observations in July of 2018 documented full range of motion of the shoulders.  The claimant's representative made much of this limitation following the hearing.  She noted one provider who had indicated the claimant was limited to rare reaching.  The undersigned rejects that limitation as inconsistent with the objective findings noting full range of motion of the shoulders in July of 2018.  By limiting the claimant to occasional overhead reaching, it is not expected her symptoms will be exacerbated.  Likewise, the claimant had some left knee changes, but her treatment has been minimal and there has been no indication of reduced range of motion, antalgic gait or instability of that particular joint.  For the claimant's back and neck problems, she has received injections with some benefit and has been maintained on conservative chiropractic care with reported improvement in functioning.  Compounding the claimant's problems is obesity.  Her representative also argued that two providers had recommended less than sedentary limitations.  The [ALJ] rejects those assessments as well as [sic] inconsistent with the more recent objective observations showing 5 [out] of 5 strength, normal gait and normal range of motion as well as the claimant's relatively intact activities of daily living.  The claimant's activities are reduced, but they are supportive of a range of light work activity.

(*Id.*)

Then, at step four, the ALJ determined that Plaintiff was capable of performing her past relevant work of a companion, DOT # 309.677-010, light, semi-skilled work with a Specific Vocational Preparation ("SVP") of 3, both as Plaintiff performed it and as it is generally performed in the national economy. (Tr. 23.)

### D.    Analysis

The Court agrees with Plaintiff that the ALJ improperly evaluated the

opinion evidence.  The ALJ gave great weight to Dr. Molis's non-examining opinion because it was "consistent with the mild to moderate spinal diagnostic imaging, the very mild shoulder imaging, the physical observations documenting 5 [out] of 5 strength of the extremities, full range of motion, normal gait and no focal neurological deficits as well as the claimant's conservative course of treatment."  (Tr. 22.)  However, in October of 2016 when Dr. Molis issued his opinion based on a review of an incomplete record, he did not have the benefit of reviewing and considering any of the subsequent treatment records and examination findings, including Dr. Lazo's MSS from July 18, 2018, which corroborated Plaintiff's complaints of pain.

Defendant argues that it was not an error for the ALJ to rely on Dr. Molis's somewhat outdated opinion because the ALJ had the benefit of reviewing the complete record before issuing his decision.  Even accepting Defendant's position, the Court notes that the ALJ's reasons for rejecting the treating and examining opinions, while according great weight to the non-examining opinion of record, are not supported by substantial evidence.

First, the examination findings were not as unremarkable as the ALJ seems to suggest.  The examinations for the relevant period consistently revealed, *inter alia*, decreased range of motion of the cervical spine; severely restricted flexion of the lumbar spine; restricted extension of the lumbar spine; restricted cervical and lumbar mobility; trigger points; spasms in the cervical, thoracic, and lumbar muscles; swelling and tenderness in the cervical and lumbar

22

spine; shoulder depression; and positive Tinel sign, O'Donahue's Maneuver, Hyperextension, Compression, Kemp's, Patrick's, Spurling's, Schepelmann's, Yeoman's, and Nachlas' tests.  (*See* Tr. 335, 338-39, 351-52, 355, 487, 525, 544-46, 590.)  Also, Plaintiff's moderate to severe pain was well-documented and confirmed by the physical examinations in the record.  (*See* Tr. 338 (noting intense pain at C3, T9 and T10 on the left, at T4 and T5 on the right, and at C4, C5, L5, and sacrum bilaterally, on palpation); Tr. 339-40, 365, 451-53, 557, 560, 563, 565, 567, 571.)

Further, in discrediting the opinions of both Dr. Pagan and Dr. Lazo, the ALJ relied on Dr. Lazo's unremarkable examination findings, such as normal extremity strength and lack of neurological deficits, but the ALJ essentially ignored positive examination findings, such as moderate muscle tension, moderate thoracolumbar scoliosis, moderate paravertebral muscle syndrome, moderate swelling, joint deformity, knee tenderness, poor balance, and inability to walk on heels.  (Tr. 593-94.)  Also, while the ALJ stated that there was "full range of motion throughout," Dr. Lazo's examination actually revealed full range of motion in the cervical spine *with discomfort* and *diminished* range of motion in the thoracolumbar spine.  (Tr. 593.)

In evaluating the medical opinions of the record, the ALJ also cited Plaintiff's normal gait, conservative course of treatment, "mild to moderate diagnostic spinal imaging, and the very mild shoulder x-rays."  (Tr. 21-22.) However, despite noting unimpaired gait and station, Dr. Lazo wrote that Plaintiff

had poor balance along with a number of other positive examination findings, which led him to assess, *inter alia*, low back pain due to lumbosacral strain, sprain, and L4-L5 herniated disc, left knee sprain, and possible medial meniscus injury.  (Tr. 594.)  Moreover, Plaintiff's antalgic gait patterns due to lumbar, knee, and foot problems were well documented in the record even prior to Dr. Lazo's examination.  (*See, e.g.*, Tr. 343, 351-52, 365, 534, 571, 590.)

Further, the results of Plaintiff's diagnostic tests were largely abnormal with mild, moderate, and severe findings.  (*See* Tr. 332, 337-38, 345-46, 356, 446.) Those results, along with the physical examination findings and Plaintiff's course (and frequency) of treatment, supported Plaintiff's complaints of disabling symptoms.  Plaintiff's treatment included medications, heat/ice packs, physical therapy, chiropractic care, and a variety of injections.  (Tr. 340, 343-44, 353, 355, 365, 367-91, 453-81, 528-80, 590.)  The injection therapy, which included epidural steroid injections, is not considered conservative care.  Moreover, after it became obvious that Plaintiff had failed conservative treatment approximately eight months after the slip-and-fall accident, she was advised to also consider surgical options.  (*See* Tr. 487, 526; *see also* Tr. 390 (having met only 30 percent of her short-term and long-term goals for physical therapy, Plaintiff was placed on hold and sent back to her medical doctor "for further investigation of symptoms" due to her "lack of progress with conservative management"); Tr. 392-93, 525.)

Based on the foregoing, the Court cannot conclude that the ALJ's reasons for discounting the opinions of Dr. Pagan and Dr. Lazo, while according great

24

weight to the opinion of Dr. Molis, were supported by substantial evidence in the record. The ALJ largely relied on *some* of the findings from Plaintiff's most recent examination performed by Dr. Lazo, while discrediting Dr. Lazo's opinions, which were based on the totality of his examination findings and review of pertinent records. Further, considering that Dr. Molis did not have an opportunity to review Dr. Lazo's examination findings and opinions, the Court can only speculate whether Dr. Molis would have reached the same conclusions if he had been presented with the complete record. Considering this uncertainty and the lack of substantial evidence to support the ALJ's reasons for discounting Dr. Lazo's and Dr. Pagan's opinions, the Court concludes that under the circumstances here, the case should be remanded for reconsideration of the opinion evidence of record.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the

25

Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on August 31, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record